WILLIAM E. SKINNER, executor &c. of A. S. Boyd, deceased,

*v.*

MARY C. CHRISTIE and husband, and the TOWN OF WEST HOBOKEN.

1. An agreement "to convey" for a full consideration "all that house and three lots of land," is not fully performed by a simple conveyance of the premises, they being subject to the lien of unpaid taxes.

2. Under such an agreement the purchaser is entitled to have all the encumbrances discharged out of the purchase-money.

3. If by fraud, accident or mistake the purchaser, under such a contract, accepts a conveyance not containing any covenants, and without having the encumbrances paid, giving back a purchase-money mortgage, he will be entitled to have the encumbrances discharged out of the money due on the mortgage.

4. Deceased orally agreed to sell a house and three lots to defendant, free and clear of all encumbrances, and afterwards, in writing, agreed to convey "all that house and three lots" to defendant. A deed, which defendant did not see, was made and recorded. It contained no covenants. Defendant was inexperienced, and did not know the difference between deeds with and without covenants, and believed that defendant, who professed to be his friend, would draw the deed according to the understanding and agreement. Several years' taxes were unpaid when the deed was made.—*Held,* that defendant was entitled to credit for the taxes against the unpaid purchase-money.

5. Act of March 25th, 1863, limits the lien for taxes to two years. Act of March 27th, 1874, incorporating a certain town, provided that a tax lien on real estate shall "remain a lien thereon until paid."—*Held,* that the latter provision superseded that contained in the general act.

Final hearing on pleadings and proofs.

This is an ordinary bill to foreclose a purchase-money bond and mortgage given by the defendants, Mrs. Christie and her husband, to complainant's testator upon the conveyance of the mortgaged premises by the latter to the former. They are dated May 1st, 1890, and their due execution and delivery are not disputed. The amount secured is $5,500, payable in five years,

with interest payable semi-annually, with the usual clause making the principal fall due upon failure to pay interest.

Three semi-annual payments of interest were made, and for failure to meet the fourth payment, which fell due May 1st, 1892, this bill was filed December 12th, 1892.

The defence is set up by combined answer and cross-bill, which was, at the hearing, amended by making the "Town of West Hoboken," in which the premises are situate, party defendant. The municipality appeared and answered. The complainant replied to the defendants' answer and cross-bill, but did not plead to the answer of the municipality, and upon those pleadings the cause was tried. The understanding, however, was that the matters set up in the answer of the municipality were put in issue by the complainant.

*Mr. John Linn,* for the complainant.

*Mr. Frederick Frambach, Jr.,* for Mrs. Christie.

*Mr. Augustus A. Rich,* for West Hoboken.

Pitney, V. C.

The defence of Mrs. Christie is that, at the date of the conveyance by Boyd to her, the premises were subject to the lien of arrears of taxes for upwards of ten years, amounting to nearly $800 besides interest; that such lien was well known to Mr. Boyd, but not to her or her husband; that the property was contracted to be sold free and clear of encumbrance; that Mr. Boyd declared them to be so at the time of the sale; that his conduct and treatment of her and her husband was fraudulent in that he concealed the existence of this lien for unpaid taxes, and managed to induce her to accept a deed for the premises without any covenants against encumbrances.

The facts, as they appeared at the hearing, are as follows:

Prior to 1879 the premises were owned by, and taxed to, one Mundorf, and were subject to a mortgage held by Mr. Boyd. This mortgage was foreclosed by Mr. Boyd, and he became the

owner under foreclosure sale by deed dated October 16th, 1879. Nevertheless, Mundorf retained possession of the property for some time, and the premises continued to be assessed to him until 1885, when they were first assessed to Mr. Boyd, and continued to be so assessed until 1892, when they were assessed to Mrs. Christie. The only taxes which have been paid since 1876 are those of 1883, paid apparently by Mundorf, and those of 1885, paid apparently by Mr. Boyd, and those of 1890, paid by Mrs. Christie. The arrearages, up to and including 1889, amount to $755.64, besides cost of sales, and interest at seven per cent. The property has been sold for taxes several times, viz., on March 14th, 1881, for the taxes of 1877 and 1878, and again on the 8th of May, 1889, for the taxes of 1886 and 1887, and again, after the sale to Christie, on the 5th of June, 1892, for the taxes of 1888 and 1889, and at each sale was bid off by the town treasurer.

For some time before the fall of 1889 the premises had been in the hands of Mr. Galbraith, a real estate agent, for sale. The price asked by Mr. Boyd was $7,000, but Mr. Galbraith was unable to get a purchaser, because, as he swears, the price was too high, and he so told Mr. Boyd. This witness fixed the value of the property at $5,500 in its then condition.

In the winter of 1889–90, Mr. Boyd expended $360, and, perhaps, something more, in repairs upon the property, and placed it in the hands of Mr. Jahl, a real estate agent, for sale. There is a dispute as to the price he directed Mr. Jahl to ask for it. Mr. Baptist, the builder who made the repairs, and who introduced Jahl to Mr. Boyd, swears it was $6,500, while Mr. Jahl swears it was $8,000. I am satisfied from the evidence and the circumstances, that while Jahl may have been instructed by Mr. Boyd to ask $8,000, he was, nevertheless, informed by him that he would sell at $6,500, and that that was the real price to be fixed upon the property, and the evidence shows that it was a full price for it.

About this time—the fall of 1889—the property came to the notice of Mr. Christie. He was a simple-minded, sober and industrious, youngish New York drayman, almost entirely in-

Skinner v. Christie.

experienced in dealing in real estate, whose wife had saved some money from his earnings, and they took a fancy to the house. This led to an interview between Jahl and Mr. Christie, in which Jahl, according to Christie, offered him the property at $6,500, free and clear of all encumbrances. Jahl swears that he asked $8,000, but is explicit in the statement that the offer was made free and clear of encumbrance, and equally explicit that he was expressly authorized by Boyd to so offer it. Mr. Christie then offered him $6,000. Mr. Jahl reported this offer to Mr. Boyd, who replied that he knew Mr. Christie, and was an old friend of his family, and that he would see him personally and could do better with him in that way than through an agent. Mr. Jahl took no further part in the negotiations. Mr. Boyd called upon Mr. Christie at his place of business in New York, but upon the objection of the complainant the latter was not permitted to testify as to what passed between them. The result was that an appointment was made for Mr. Christie to call on Mr. Boyd at his house at Hackensack, and bring with him Mr. Boyd's confidential business man, Mr. Hulshizer, of Hoboken. The meeting took place and resulted in the following contract, written by Mr. Hulshizer, who acted as amanuensis on account of Mr. Boyd's defective eyesight :

"1890

"HACKENSACK, N. J.    March 21st

"In consideration of One Hundred Dollars in hand paid to me by Gamaliel R. Christie, I hereby agree to convey all that house and three lots of ground situated on the North West corner of Palisade Ave. and Lake St. West Hoboken, Hudson County, New Jersey, to Mary R. Christie, wife of said Gamaliel R. Christie, on or before the first day of May, 1890, at which time the said Gamaliel R. Christie and wife agree to pay to me the sum of One Thousand Dollars and also to execute a Bond and Mortgage for the sum of Five Thousand Five Hundred Dollars to run for five years, with the privilege of paying one thousand dollars or more each year during the said period or the whole amount.

"Witness our signatures this twenty first day of May,* 1890.

"A. S. BOYD

"Witness                                            "G. R. CHRISTIE.

"D. J. HULSHIZER."

* May is evidently a clerical error for March.

On the 1st day of May, Mr. and Mrs. Christie, at the request of Mr. Boyd, went to Hackensack with Mr. Hulshizer and met Mr. Boyd at his house, for the purpose of closing the contract. Mr. Boyd had caused the deed and the bond and mortgage to be prepared, and had himself, on the same morning, executed and acknowledged the deed in Hoboken, where his office and business was, but had returned to his house at Hackensack to meet Mr. and Mrs. Christie. They executed the bond and mortgage at Hackensack, and the three instruments were placed in Mr. Hulshizer's hands to be recorded, and were lodged in the register's office for that purpose by him. The deed was not handed to Mr. or Mrs. Christie, and was not seen or examined by them until after its record. It contained no covenants whatever. Mr. Boyd died in October, 1890. Mrs. Christie paid her interest regularly for one year; also the taxes for 1890. In the fall of 1891 the town authorities demanded of Mrs. Christie payment of these arrears of taxes, which was the first notice the Christies had of their existence. They at once called on the complainant and asked that he should pay and discharge them, and objected to paying further interest on their mortgage until the taxes were settled. The complainant, after examination, replied that, as their deed contained no covenants, he could do nothing for them, and induced them to pay another installment of interest upon the understanding that they should not be prejudiced thereby. Afterwards, under advice of counsel, defendants declined to pay further interest until the matter of taxes in arrears should be arranged, and this bill was filed December 12th, 1892. In the meantime, the property had been sold for the taxes of 1888 and 1889.

Mr. Boyd was a practicing lawyer, living in Hackensack, but had his office in Hoboken, where he had business interests. He must have known of these arrears of taxes. He made application in his foreclosure proceedings for the appointment of a receiver, in which he swore that Mundorf was allowing the taxes to get in arrear, and he received, regularly, notices of the taxes each year after they were assessed to him.

Mr. Christie, who, throughout, looked after the affair for his wife, was born and reared in Bergen county, of which his father was at one time sheriff. Mr. Boyd was, or pretended to be, a friend of his father and to have known him from infancy. Christie knew Mr. Boyd was a lawyer and a man of wealth, and had full confidence in him, and believed him to be his friend; and Mr. Boyd's manner and action towards Mr. Christie was such as to inspire such belief and confidence. Relying upon Mr. Boyd's friendship and wealth, he did not suspect even that there were any arrears of taxes or other encumbrances upon the property, and made no search for any, and employed no counsel to examine the title. He did not know the difference between a deed *without* and one *with* covenants. I am satisfied that the interviews for the transaction of this business were arranged by Mr. Boyd to take place at Boyd's house, at Hackensack, instead of at his office in Hoboken, for the purpose of lessening the chances of the question of arrearage of taxes being raised or looked into, or of the character of the deed being discovered.

Upon these facts two distinct questions arise. *First.* Assuming that some taxes were in arrear and a lien upon the premises, is the defendant Mrs. Christie entitled to relief against the complainant? And, *second,* what taxes, if any, were a lien upon the premises in May, 1890?

The first question is between complainant and Mrs. Christie, and the second between the complainant and the municipality.

And, first, I think it quite clear that, by the written contract of March 21st, 1890, and quite independent of the previous verbal statement made by Jahl to Christie, Mrs. Christie was entitled to a conveyance free and clear of all encumbrances. The language—" I agree to convey all that house" &c.—amounts to an undertaking to convey a complete title in fee simple, free and clear of encumbrances. *Lounsbury* v. *Locander, 10 C. E. Gr. 554* (at *p. 556*), and cases cited. The doctrine there announced by the court of errors and appeals was recognized by Chancellor Runyon in *Newark Savings Institution* v. *Jones, 10 Stew. Eq. 449; S. C. affirmed on appeal, 11 Stew. Eq. 299.* That was a suit by vendor against vendee to compel specific per-

formance of a contract to convey, and the question was whether the vendor should pay out of the purchase-money agreed upon large arrears of taxes resting as a lien upon the premises, or whether the purchaser was to pay the full purchase-money and assume the burden of the taxes. The agreement there, as here, was a simple agreement to " buy the premises," without expression as to the character of the title to be conveyed or as to encumbrances. At. *p. 451* the learned chancellor says: " The agreement is silent as to the character of the title to be given, and while, in such cases, in the absence of proof to the contrary, the implication arises that the title to be conveyed is to be a good one, *and therefore free from encumbrance,* that implication may be rebutted." He then proceeds to show, from the parol evidence, that the contract there was to convey subject to the taxes.

There is nothing in the case now in hand to rebut the implication which arises from the language of the contract. On the contrary, the parol evidence in this case—which Chancellor Runyon expressly held in the case just cited was competent for that purpose, and was therein affirmed on appeal—shows, clearly, that a title was to be given free and clear of encumbrance.

Now, Mrs. Christie has fulfilled her part of the contract by paying and securing the contract price as stipulated for, while Mr. Boyd did not perform his part, but failed in that he did not convey the premises free from encumbrance. It is equally clear, from the evidence, that Mrs. Christie did not accept the conveyance as a fulfillment of the contract, knowing that there were encumbrances upon the said land conveyed. She supposed she was getting a perfect title. She did not intend to waive her rights in that behalf. The language of Chancellor Zabriskie, in *Conover* v. *Wardell, 5 C. E. Gr. 266* (at *p. 271*), seems to me to apply here. He says: "A suit may be maintained to compel the performance of the contract performed only in part, and a party will not be precluded by his acceptance of a deed in performance of a contract when such acceptance was under a mistake as to the contents or effect of the deed."

I am unable to perceive any distinction between the case of a conveyance of a *part* of the land agreed to be conveyed and a conveyance of the *whole, subject to encumbrances.* The failure to fulfill the contract of sale is quite as complete in the case of a conveyance subject to encumbrances, when it should be free and clear of encumbrance, as it is when the conveyance omits a part of the premises contracted to be conveyed. See, on this subject, *Rowley* v. *Flannelly, 3 Stew. Eq. 612.*

Mrs. Christie, at the delivery of the deed, had a clear right to have the arrears of taxes due upon these premises, so far as they were liens, paid and discharged out of the purchase-money. This seems too clear for dispute or discussion. In my judgment, she did not, under the circumstances as I have found them to exist, lose that right by accepting a deed of conveyance without covenants, and hence she is still entitled to have them discharged out of the purchase-money still remaining unpaid, although secured, as it is, by the bond and mortgage under foreclosure.

This result would arise out of the bare fact that the parties had, through mistake, given and accepted a conveyance without covenants, both being ignorant of the encumbrance.

But the case here does not rest on the ground of mere mistake. I am satisfied that a fraud was practiced upon the defendants by Mr. Boyd. As before remarked, he must have known of these arrears of taxes. They were taxes that were assessed annually upon his premises, and not only do the proofs show that notices were regularly sent to him, but he was too good a business man not to know that his premises were subject to an annual tax. Then, as I have said before, though doing business in Hoboken and visiting there constantly, he arranged these meetings at his house in Hackensack, and there, when the contract was signed, spoke of his friendship and long acquaintance with Mr. Christie's father, and when the deed came to be delivered, money paid and bond and mortgage executed, he arranged for this to be done at Hackensack, and prepared and executed himself a deed without any covenants whatever.

Now, of the hundreds and thousands of transfers of real estate which take place in this state in each year, I venture to

say that it very rarely happens that a deed is delivered and accepted without any covenant whatever, and the mere fact that Boyd gave such a deed to these defendants, who were ignorant of the varying qualities of deeds of conveyance and were acting entirely without counsel and in reliance upon him, indicates that he had a sinister motive in so doing. And another circumstance, not without significance, is that the price for the premises was a full one—all they were worth.

The case, as presented, shows an equitable right in Mrs. Christie, connected with and fastened upon this fund represented by the bond and mortgage sought to be foreclosed.

The right to defensive relief in such cases is well settled. *White* v. *Stretch, 7 C. E. Gr. 76; O'Brien* v. *Hulfish, 7 C. E. Gr. 471,* per Chief-Justice Beasley speaking for the court of errors and appeals; *Dayton* v. *Dusenbery, 10 C. E. Gr. 110,* and cases cited; *Bank* v. *Pinner, 10 C. E. Gr. 495; Stiger* v. *Bacon, 2 Stew. Eq. 442,* and cases cited.

It is true that, in most of those cases, there was a covenant in the conveyance which would give the party an action at law.

But I think a close examination of the authorities shows that the real question in this and other like cases is, of necessity, one of convention. If the question be one of area, it will be solved by answering the inquiry, what was the contract between the parties? Did they contract upon the basis that the premises did or should contain so many acres or so many square feet, or did they contract without regard to the precise quantity of land contained within the boundaries mentioned? So with regard to the quantity of the estate. Did they contract with regard to a complete title, or to a fractional part of the title, as one-half or three-quarters? Or did they contract to take whatever title the grantor might have? And so with regard to encumbrances. Did the purchaser agree to take the title subject to all encumbrances which might be upon it, or was it the agreement that he should have it free from encumbrance? If the agreement was that he should have it free from encumbrance, then the mere fact that, either through fraud or mistake, he took it by a deed which did not expressly protect him in that regard, does not

deprive him of the right to have it free from encumbrance. The presence or absence in the deed of conveyance of a covenant against encumbrances tends only to show what was the real agreement between the parties. Its presence shows clearly that the agreement was that the premises should be clear of encumbrance. Its absence tends strongly to show that the agreement was that the premises were to be conveyed subject to encumbrances, but in neither case is it conclusive, and in equity either mistake or fraud will warrant the resort to other evidence to show the real intention and agreement of the parties. *Newark Savings Institution* v. *Jones, supra; Mellick* v. *Dayton, 7 Stew. Eq. 245* (at *p. 249*).

My conclusion is that Mrs. Christie is entitled to relief against these taxes.

The next question is as to the existence and extent of the lien. The complainant denies that there is any lien. He claims that the Town of West Hoboken is governed, in respect to the lien of taxes, by the General Tax act of March 25th, 1863 (*Rev. of 1877 p. 1165 ¶ 122*), which limits the lien to two years from the time when the taxes were payable, and he contends that whatever lien there may have been for recent taxes at the date of the sale expired by the lapse of time before the sale of June, 1892, and that the lien of all previous taxes, with the possible exception of one or two years, expired for the same cause. On the other hand, the municipality contend that, by its special charter, these taxes are declared to be a lien *until paid*.

The town was incorporated by an act entitled "An act to reorganize the local government of the township of West Hoboken," approved March 27th, 1874 (*P. L. of 1874 p. 594*). This act defines the boundaries of the municipality, and gives its officers extensive and varied municipal powers quite equal to those of an ordinary city. The thirty-fourth section (at *p. 614*) declares

"That all taxes and all assessments which shall hereafter be levied, assessed or made upon any lands, tenements or real estate situate in the said township of West Hoboken *shall be and remain a lien thereon until paid,* notwithstanding any devise, descent, alienation, mortgage or other encumbrance thereof, and

if the full amount of any such tax or assessment shall not be paid and satisfied within the time limited and appointed for the payment thereof, it shall and may be lawful for the township committee to cause such lands, &c., to be sold " &c.

It is argued by counsel of complainant that the omission of the words " for two years," found in the general act of 1863, and the insertion in place thereof of the words " until paid," is not sufficient to show a legislative intent to establish a rule for this municipality different from that established for all townships. He contends that the variation in language in the later act is accounted for by the words which follow relating to a devise, descent and mortgage thereof.

I am unable to accede to this view. The change in the language is too significant to be accounted for by such hypothesis. The same language is found in the charters of Hoboken (*P. L. of 1855 p. 448 § 48*), of Bergen (*P. L. of 1868 p. 314 § 48*), of Bayonne (*P. L. of 1869 p. 371 § 46*), of Harrison (*P. L. of 1869 p. 683 § 20*), of Union (*P. L. of 1874 p. 648 § 20*), and of New Brunswick (*P. L. of 1875 p. 374 § 3*). Of other charters granted about the same time, some use the same language as found in the General Tax act of 1863 and others use the same as that in the charter of West Hoboken, but limit the period in some instances to two years and in others to four years; and in some instances this language is accompanied by the same language as to devises, alienations, mortgages &c. City of Elizabeth (*P. L. of 1869 p. 1092 ¶ 7*), city of Passaic (*P. L. of 1873 p. 484 § 41*), Newark, cited in *State* v. *Newark, 13 Vr. 38* (at *p. 39*); Trenton, cited in *Trustees &c.* v. *Trenton, 3 Stew. Eq. 667* (at *p. 674*) (*P. L. of 1874 p. 331 § 61*).

The provisions of the charter of the city of Trenton, in this respect, are quite similar to those in the charter of West Hoboken, and were construed in the case just cited to give the lien of the taxes priority over mortgages; and Chancellor Runyon, in *Kirkpatrick* v. *New Brunswick, 13 Stew. Eq. 46* (at *p. 54*), says: " The words 'notwithstanding any devise, descent, alienation, mortgage or other encumbrance' were used merely to

declare the paramount nature of the lien for the designated period."

It is quite impossible to suppose that the legislature would, within a period of a decade or less, use the varying language which they have in so many instances, without intending to use it in a varying sense.

In this connection it is important to observe that the charter of West Hoboken places taxes and assessments for improvements upon the same basis, and it would be strange indeed if the legislature would limit the lien of an assessment for municipal improvements to the period of two years.

But complainant further relies upon the General Tax act of March 14th, 1879 (*P. L. of 1879 p. 340; Rev. Sup. p. 990 ¶ 50 et seq.*), as superseding all previous special acts applying to townships. That act limits the lien to two years, but by its terms it is restricted to taxes thereafter to be assessed, and by its eighteenth section (*Rev. Sup. p. 993 ¶ 65*), it expressly reserves all liens already existing.

The result is that the lien of the taxes of 1877–78, upon the premises in question, were not disturbed by the act of 1879, even if, by its true construction, it was intended to apply to a municipality such as was West Hoboken.

Nor do I see that the proceedings for sale provided by the West Hoboken charter, and pursued by its officers in 1881, were inconsistent with the provisions of the act of March 14th, 1879. If this be so, then the tax sales of 1881 were not made too late, and there is no occasion for further inquiry, for, by another act of March 14th, 1879 (*P. L. of 1879 p. 298; Rev. Sup. p. 604 ¶ 494*), no further sale·was necessary, and the lands cannot be redeemed without paying all taxes subsequently assessed. But, in my judgment, the General Tax act of March 14th, 1879, did not alter the charter of West Hoboken. The eighteenth section, above referred to, prevented that result. West Hoboken was clearly within the exception there mentioned; and if there be any doubt about the force of the eighteenth section, in that respect, it is set at rest by the subsequent declaratory act of May 6th, 1889. *P. L. of 1889 p. 357.*

The two certificates of sale of 1881 seem to be quite regular and complete. Several criticisms were made upon them, or rather upon the absence of proof that they had been duly acknowledged, recorded &c. Without inquiring what value these criticisms would have in defence to an action of ejectment brought by a third party, who purchased at the sale, it is enough to say that here the sale was to the municipality. The certificates are produced by the municipality, and, as between the immediate parties, the objections are without strength. There are, besides, the validating acts of 1888. *P. L. of 1888 pp. 179, 482.*

I hold the certificates of sale of 1881 to be valid, and that under the Township act of March 14th, 1879, it is immaterial for how long taxes subsequently assessed remain a lien, as the premises cannot be redeemed from the effect of the sale of 1881 without paying all taxes subsequently assessed.

Complainant refers to the act of March 25th, 1884 (*P. L. of 1884 p. 90; Rev. Sup. p. 1081 ¶¶ 272, 273*), by which the township governed by a special charter was authorized to change its name, and shows that West Hoboken did change its name thereunder June 20th, 1884. The second section of that act provides that when any of the provisions of the charter of such town shall be inconsistent with the provisions of any general statute theretofore passed or thereafter to be passed by the legislature, affecting or applying to incorporated towns, the inconsistent provisions shall be deemed to be repealed, and counsel for the complainant contended that the General Tax act of March 14th, 1879, before referred to, was such an act. For reasons already stated, I cannot so construe it; and further, even if such were its effect, it would not divest the rights of the municipality under the sale of 1881 and the Township act of 1879.

Counsel for complainant cites still another act, viz., that of March 17th, 1882. *P. L. of 1882 p. 130; Rev. Sup. p. 996.* That act provides that taxes levied within any incorporated city, village, borough or other municipality of the state upon lands lying therein shall be, become and remain a full and complete first and paramount lien on all the lands on account of which

said levy and assessment shall be made for and during the period now provided for in the act of incorporation, or any supplement thereto or revision of the same of any such city, village, borough or other municipality as aforesaid, *or if no such period is provided in such act of incorporation,* supplement or revision, for and during the period of three years. And he argues that that act applies to West Hoboken because no time is, as he argues, mentioned in its charter for which taxes shall be a lien.

If this argument were sound it would not affect the rights of the township, provided my conclusion is correct as to the effect of the tax sale of 1881. But be that as it may, I am unable to adopt the construction of this act contended for by the counsel of complainant. There were several special boroughs in the state which had no provision on the subject of taxes being a lien upon lands. For instance, Guttenburg (*P. L. of 1859 p. 199; P. L. of 1875 p. 612*) and Morristown (*P. L. of 1865 p. 819*); and I think it was not the intention of the legislature to interfere with such a charter as that of West Hoboken, which provided that the tax should remain a lien until paid. In such case it cannot be said that no period of time is provided in its act of incorporation. "Until the tax is paid," is a period of time.

In 1892, West Hoboken became incorporated under the General Tax act of 1888 (*P. L. of 1888 p. 483*), and by the seventy-ninth section of that act it is provided "that all taxes and all assessments heretofore or hereafter levied, assessed or made upon any lands, &c., shall be and remain a lien on the lands on account of which the assessments are made until paid." And counsel for defendant argues that that would cure any defect in the lien of previous taxes assessed, by retroactive action. But I do not find it necessary to consider whether that argument is well founded or not, for, independent of that act, upon a consideration of the previous legislation, I come to the conclusion that all the taxes above mentioned are liens upon the premises.

The result is that Mrs. Christie was justified in demanding that the complainant should pay these taxes, and in refusing to pay her interest until he should do so. This relieves her from

the position of being in default with her interest when the bill was filed. As the period of five years from the date of the mortgage had not elapsed nothing was due upon it, and the complainant was not entitled to take advantage of the thirty days' clause and declare the mortgage due for non-payment of interest.

During the hearing, the defendant, by my direction, paid complainant $500, to be applied as the court should finally direct.

Unless the parties can agree upon the amount due, with interest, for taxes, there must be a reference to a master to settle that, and when it is settled, either by counsel or report of the master, there will be a decree that the complainant pay the same, or, if he shall fail to do so for thirty days, then that Mrs. Christie may pay the same, and the amount so paid shall be allowed as a credit upon her mortgage. The amount so to be credited, with the $500 already paid, will be applied as follows: first, to the payment of the several installments of interest which have fallen due since the 1st of November, 1891, and, then, what may remain, to the payment of so much on account of the principal of the mortgage.

The defendants are both entitled to costs against the complainant, to be paid out of the estate, or if complainant shall fail to pay them, then Mrs. Christie must pay the costs of the municipality, and shall be entitled to a credit upon her mortgage for the amount of her own costs and the costs so paid to the municipality.